UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


HUMBERTO S. LOPEZ, Trustee of the H.S.
LOPEZ FAMILY TRUST,

        Plaintiffs,

                                      File No.  1:09-CV-814

v.

                                      HON. ROBERT HOLMES BELL

CAPITOL BANCORP LTD., a Michigan
corporation, and CAPITOL DEVELOPMENT
BANCORP LIMITED III, a Michigan
corporation,

        Defendants.

_____/

## **O P I N I O N**

       This action comes before the Court on Plaintiff Humberto S. Lopez's  motion for a

preliminary injunction. (Dkt. No. 2, Pl.'s Mot.)  On September 2, 2009, Plaintiff filed an ex

parte motion for a temporary restraining order ("TRO") and preliminary injunction

preventing Defendant Capitol Bancorp Ltd. ("CBC") from closing an exchange offer

initiated under an S-4 registration statement offering CBC Series A Preferred and Trust-

Preferred Stock for Capitol Development Bancorp Limited III ("CDBL-III") stock. (Id.)  On

September 4, 2009, Plaintiff withdrew his request for a TRO on the condition that Defendant

would voluntarily delay closing the exchange offer at least until the Court could conduct a

hearing on Plaintiff's motion for a preliminary injunction.  (Dkt. No. 7, Pl.'s Reply 1 n.1.)

On September 4, 2009, the Court denied Plaintiff's motion for a TRO, but scheduled a hearing on Plaintiff's preliminary injunction motion for September 16, 2009. (Dkt. No. 8, 09/04/2009 Order.) On September 8, 2009, Defendant agreed to delay exchanging CBC stock for CDBL-III stock at least until the conclusion of the September 16 hearing. (Dkt. No. 9, 09/08/2009 Def.'s Resp. to Pl.'s Letter 3.) At the September 16 hearing, Defendant informed the Court that it intended to close the exchange offer at 11:59 p.m. on Monday, September 21, 2009, if the Court did not grant Plaintiff's request for an injunction. For the reasons that follow, the Court shall grant Plaintiff's motion for a preliminary injunction preventing Defendant CBC from closing the exchange offer until the Court can adjudicate Plaintiff's declaratory judgment action and action under Section 11 of the Securities Act of 1933.

## I. Factual Background

Defendant CBC is a national bank holding company that creates and operates small independent community banks throughout the country. Defendant uses partially owned subsidiaries to organize and capitalize these community banks. These subsidiaries are all called "Capitol Development Bancorp Limited" (CDBL), followed by a roman numeral.

On April 12, 2005, Defendant filed articles of incorporation for CDBL-III ("the Articles"). The Articles authorized the issuance of 36,000 shares of Class A stock and 15,000 shares of Class B stock in CDBL-III. However, CDBL-III issued only 1,000 shares of Class A stock and 14,745 shares of Class B stock. Defendant purchased all 1,000 shares of Class A stock. Approximately ninety individual investors purchased all 14,745 shares of Class B stock. Plaintiff purchased approximately 850 shares of Class B stock.

As a condition of CDBL-III's permission to operate as a bank holding company, the Federal Reserve required that CBC retain a majority interest in Class A CDBL-III stock at all times. CBC and CDBL-III executed two agreements, a Warrant agreement and an Antidilution Agreement, both intended to permit CBC to honor this commitment. The Warrant agreement permitted CBC to purchase up to 14,500 shares of Class A CDBL-III stock at a price of $2,000 per share at any time prior to June 30, 2009, the date on which the Warrant agreement expired. The Antidilution Agreement provided that, in the event CDBL-III undertook an offering of stock, CBC would be permitted to "purchase sufficient stock . . . to retain 51% of the voting control of CDBL-III."

The Articles provide holders of Class A stock the right to vote (one vote per share) on all CDBL-III matters submitted to a shareholder vote. The Articles provide holders of Class B stock the right to vote only on certain transactions, including any sale of a "major portion" CDBL-III assets.[1] The Articles did not explicitly provide holders of Class B stock the right to vote on amendments to the Articles.

The Articles originally provided that all outstanding shares of Class B stock would automatically convert to Class A stock on May 12, 2009, or on a date designated by the CBC board of directors in its sole discretion. However, on May 11, 2009, Defendant, as sole Class A shareholder, voted to amend the Articles to postpone the automatic conversion date one year, to May 12, 2010.

---

[1] The Articles define a "major portion" of CDBL-III assets as "equal to or exceeding the lesser of $2,000,000 or 20%" of CDBL-III's assets.

3

CDBL-III owns the Bank of Santa Barbara, among other small community banks. On July 10, 2009, Defendant entered into an agreement to sell 51 percent of the Bank of Santa Barbara to a third party. Defendant has also expressed an interest in selling various other assets owned by CDBL-III. The CDBL-III assets targeted for sale by Defendant appear to comprise a "major portion" of CDBL-III's assets. Thus, Defendant will not be able to conduct these sales without a majority vote of all outstanding shares of Class A and Class B stock. Plaintiff does not approve of the sale of the Bank of Santa Barbara and other assets.

Defendant is currently attempting to accumulate shares of CDBL-III Class B stock, as well as shares of CDBL-IV, V and VI stock. On August 20, 2009, Defendant initiated an exchange offer by filing an S-4 registration statement with the SEC. Pursuant to the exchange offer, Defendant has offered to exchange a set number of Defendant's CBC Series A Preferred and Trust-Preferred stock for all outstanding shares of CDBL-III Class B stock, and all outstanding shares of stock in CDBL-IV, V, and VI. Because holders of Class B stock can withdraw exchange commitments until the expiration of the exchange offer, exchange commitments currently pending technically do not become effective until the exchange offer closes. Defendant has indicated that it intends to close the exchange offer at 11:59 on Monday, September 21, 2009.

## II. Law and Analysis

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."

Overstreet v. Lexington-Fayette Urban County Gov't, 305 F.3d 566, 573 (6th Cir. 2002). In determining whether to issue a preliminary injunction, the Court must consider four factors; (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant is likely to suffer irreparable harm if the injunction is not issued; (3) whether the issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction. Leary v. Daeschner, 228 F.3d 729, 736 (6th Cir. 2000). A court must balance these factors. They are not necessarily requirements. In re Delorean Motor Co., 755 F.2d 1223, 1229 (6th Cir. 1985).

1. Likelihood of success on the merits

In addition to his request for a preliminary injunction, Plaintiff has asserted two causes of action. Plaintiff first seeks a declaratory judgment rendering the May 11, 2009, amendment to the Articles void and establishing that all shares of Class B CDBL-III stock converted to shares of Class A CDBL-III stock on May 12, 2009. (Dkt. No. 1, Pl.'s Compl. 12-14.) Second, Plaintiff brings an action under Section 11 of the Securities Act of 1933. (Id. at 16-18.) For the reasons that follow, Plaintiff is likely to succeed in his declaratory judgment action, but not in his action under Section 11.

A. Declaratory Judgment Action

Plaintiff first seeks a declaratory judgment rendering the May 11, 2009, amendment to the Articles void and establishing that all shares of Class B CDBL-III stock converted to shares of Class A CDBL-III stock on May 12, 2009. Under Mich. Comp. Laws § 450.1615(1):

5

The holders of the outstanding shares of a class may vote as a class upon a proposed amendment, whether or not entitled to vote thereon by the articles of incorporation, if the amendment would increase or decrease the aggregate number of authorized shares of the class, or alter or change the powers, preferences or special rights of the shares of the class or other classes so as to affect the class adversely.

On May 11, 2009, Defendant, as sole Class A shareholder, amended the Articles to postpone the date on which Class B shares of CDBL-III automatically converted to Class A shares of CDBL-III. Class B shareholders were not permitted to vote on this amendment. The amendment therefore is valid only if it did not alter the rights of the Class B shareholders "so as to affect the class adversely."

Defendant first argues that the amendment did not alter the rights of the Class B shareholders at all. According to Defendant, even after the amendment, "[e]ach of the shareholders, including Plaintiff, still had (and has) the right to request a conversion by the Board," and that this right to request conversion, if exercised, would instantly make Plaintiff a Class A shareholder. (Dkt. No. 6, Def.'s Resp. 9.) Defendant, however, does not identify the source of this right. The Court therefore will assume that the right to request conversion relied on by Defendant arises from the language in the Articles providing that conversion may occur on "any date designated by the Board of Directors in its sole discretion." (Dkt. No. 1, Pl.'s Compl. Ex. A at 2.) Even if this provision did provide Plaintiff with a right to request conversion at any time, there is nothing that obligates the CDBL-III Board to grant the request. Further, even if Defendant did demonstrate with certainty that the CBDL-III Board

6

would definitely grant such a request, this would not mean that the rights of Class B shareholders had not been altered. Section 450.1615(1) not only protects the rights of Class B shareholders to convert to Class A, it protects the rights of Class B shareholders to *automatically* convert to Class A. The amendment undisputedly altered this right.

Defendant next argues that, even if the amendment did alter the rights of the Class B shareholders, it did not do so adversely. The Articles provide that Class A shareholders are permitted to vote on any CDBL-III matter submitted to a shareholder vote, while Class B shareholders are permitted to vote only on certain limited matters. (Dkt. No. 1, Pl.'s Compl. Ex. A. p. 2.) Additional voting rights not only provide Class A shareholders with a say in a broader spectrum of corporate affairs, but they make the shares more valuable. (Def.'s Ex. B.)[2] Plaintiff argues that the amendment did adversely affect the rights of Class B shareholders because it postponed by one year the date on which Class B shareholders were able to realize the increased voting rights and value associated with Class A shares. (Dkt. No. 1, 09/02/2009 Pl.'s Compl. 7-8.)

Defendant argues that, even in spite of this effect, the amendment actually benefitted the Class B shareholders. (Dkt. No. 6, Def.'s Resp. 7-10.) Defendant argues that the precise nature of this benefit, however, depends on whether Defendant would have decided to purchase additional Class A CDBL-III shares immediately following the conversion. (Id.; Dkt. No. 10, Def.'s Supp. Br. 5-7.)

---

[2]Documents referenced as "Def.'s Ex." are exhibits introduced by Defendant during oral argument.

If Class B shares converted to Class A shares on May 12, 2009, the number of Class A shares would have increased to 15,745. Former Class B shareholders would have held 14,745, or 94%, of these shares. CBC would have held only 6%. As a condition of CDBL-III's approval to operate as a bank holding company, the Federal Reserve required that Defendant retain a majority of Class A CDBL-III stock at all times. (Def.'s Ex. 2; Dkt. No. 10, Def.'s Supp. Br. 7.)

Defendant first argues that, if it would have decided to honor its commitment to the Federal Reserve, Defendant would have purchased 14,347 authorized but unissued shares of Class A CDBL-III stock immediately following the conversion on May 12, 2009. Defendant argues that this stock purchase would have diluted the value of the CDBL-III shares held by the former Class B shareholders, and for this reason it would have been adverse to the Class B shareholders. According to Defendant, by blocking the sudden mass increase of Class A shares on May 12, 2009, the amendment eliminated the need for Defendant to purchase new shares and dilute the value of the existing shares, and in this respect the amendment was beneficial to the Class B shareholders. (Dkt. No. 10, Def.'s Supp. Br. 5-6.)

Defendant's argument is valid only if any stock purchase made by Defendant following the May 12, 2009, conversion actually would have diluted the value the of Class B shares. For dilution to occur, Defendant would have had to purchase each share at a price lower than the value of each outstanding share at the time of the purchase. As of June 30,

2009, the face value of each existing share was $905.05.[3] (Def.'s Ex. 1 at 9.) The issue therefore is whether, if Defendant would have purchased 14,347 authorized but unissued shares of Class A CDBL-III stock immediately following the conversion on May 12, 2009, the per share purchase price of that stock would have been greater than or less than $905.05.

Plaintiff argues that the per share purchase price would have been $2,000. (Dkt. No. 11, Pl.'s Supp. Br. 5.) Plaintiff directs the Court's attention to a Warrant agreement between Defendant and CDBL-III. (Def.'s Ex. 3.) The Warrant agreement permits CBC to purchase up to 14,500 authorized but unissued Class A shares at an exercise price of $2,000 per share. Defendant counters that the per share purchase price would have been $484. (Dk.t No. 10, 09/09/2009 Def.'s Supp. Br. 6.) Defendant directs the Court's attention to an "Antidilution Agreement" between Defendant and CDBL-III. (Def. Ex. 2.) The Antidilution Agreement provides that, in the event CDBL-III initiates a stock offering, Defendant is entitled to purchase the shares necessary for it to retain a majority interest at a "fair" price determined by the CDBL-III board of directors. Defendant argues that the board would have charged defendant $484 per share, since that was the value of the shares as contemplated by the exchange offer.

---

[3]The Court notes that the most relevant date on which to assess the value of the shares is May 12, 2009, since that is likely the date on which Defendant would have purchased the additional shares. However, the evidence before the Court does not indicate the value of Class A CDBL-III stock on May 12, 2009. June 30, 2009 is the date closest to May 12, 2009 for which stock price information is in front of the Court. There is no indication that the value of Class A CDBL-III drastically fluctuated between these two dates. For this reason, as a proxy the Court will use the value of Class A CDBL-III shares as of June 30, 2009.

The Court holds that either the Warrant agreement or the Antidilution Agreement could have applied to any purchase of authorized but unissued CDBL-III Class A stock made by Defendant immediately following conversion on May 12, 2009. The Warrant agreement did expire on June 30, 2009, but it would have still been valid at the time Defendant would have made its stock purchase. Additionally, the Antidilution Agreement does not apply to exchange offers, but Defendant would have purchased additional authorized but unissued Class A CDBL-III stock pursuant to an "offering" of that stock, not pursuant to the exchange offer. If the Warrant agreement governed Defendant's purchase, the per share purchase price would have been $2,000, as provided by the agreement itself.[4] If the Antidilution agreement would have governed, the Court does not accept Defendant's argument that the per share purchase price would have been $484 per share. The Court does not agree that the CDBL-III board of directors would have determined that $484 per share was a "fair" price when that price would have drastically diluted the value of the existing shares. In fact, the Court does not agree that the board of directors would have determined that any price that diluted the value of existing shares was a "fair" price, as that term is used in the Antidilution Agreement.

Thus, regardless of whether Defendant had purchased additional shares after the conversion date on May 12, 2009, pursuant to the Warrant agreement or the Antidilution Agreement, the Court holds that the per share purchase price would likely have been at least

---

[4]The Warrant agreement does permit the CDBL-III Board of Directors to change the exercise price at any time in its sole discretion. (Def.'s Ex. 3.) However, there is no indication that the board did change the purchase price, or that it would have changed the purchase price prior to any purchase by Defendant.

§905.05. Defendant's purchase would not have diluted the value of existing shares. The May 11, 2009, amendment therefore did not protect the Class B shareholders from a dilution in the value of their shares.

Defendant alternatively argues that, if it would have decided not to honor its commitment to the Federal Reserve, some former Class B shareholders would have been in jeopardy of losing their voting interest in CDBL-III altogether. (Dkt. No. 6, Def.'s Resp. 8; Dkt. No. 10, Def.'s Supp. Br. 7-8.) Had the automatic conversion occurred on May 12, 2009, all former Class B shareholders would have assumed full voting interests in CDBL-III for the first time. Regulation Y requires shareholders who acquire at least 10% of a class of voting stock to provide notice to the Federal Reserve prior to the acquisition. 12 C.F.R. § 225.41. Defendant argues that shareholders who acquire at least 10% of a class of voting stock may be subjected to a rigorous financial investigation by the Federal Reserve, and in some cases these shareholders may be stripped of their voting rights altogether. Defendant argues that, by delaying the former Class B shareholders' acquisition of voting stock, the amendment precluded the possibility that any of these shareholders would fail Federal Reserve scrutiny and thus lose all their voting rights. (Id.) According to Defendant, the amendment actually benefitted the Class B shareholders in this respect.

Defendant's argument requires the Court to make too many unsupported assumptions. It first requires the Court to assume that Defendant would have decided not to honor its commitment to the Federal Reserve to retain a majority interest in CDBL-III stock. The

parties have not fully briefed the consequence of such a decision, but the Court presumes that Defendant had a strong interest in honoring a commitment it made to the regulators. If Defendant would not have honored its commitment, Defendant's argument next requires the Court to assume that the Federal Reserve would have subjected any of the former Class B shareholders to the federal approval process set forth under Regulation Y. As mentioned, Regulation Y applies to shareholders who acquire 10% or more of a class of voting stock. 12 C.F.R. § 225.41. None of the former Class B shareholders would have acquired interests this large after conversion. (Dkt. No. 10, Def.'s Supp. Br. 7.) Defendant argues that the Federal Reserve has lately been investigating shareholders acquiring voting interests of even less than 10% in light of the current financial climate. (Id.) There is no particular indication, however, that the Federal Reserve would have broadened the application of Regulation Y with respect to any of the former Class B CDBL-III shareholders. If Defendant would have decided not to honor its commitment to the Federal Reserve, and if the Federal Reserve would have decided to subject any of the former Class B CDBL-III shareholders to Regulation Y, Defendant's argument next requires the Court to assume that the former Class B CDBL-III shareholders would not have passed muster under Regulation Y. There is no evidence that any of the former Class B shareholders were financially infirm to this degree. Defendant has not convinced the Court that the May 11, 2009, amendment prevented the Federal Reserve from stripping any of the CDBL-III shareholders of their voting rights, nor has Defendant convinced the Court that the amendment thus represented a corresponding benefit to Class B shareholders.

Regardless of whether Defendant decided to honor its commitment to the Federal Reserve and purchase 14,347 Class A shares immediately following the conversion on May 12, 2009, or not, the May 11, 2009, amendment did not have any legitimate beneficial effect on Class B shareholders. Conversely, by postponing the automatic conversion rights of Class B shareholders, the amendment did have an adverse effect on Class B shareholders, and for this reason the amendment likely violated Mich. Comp. Laws § 450.1615(1).

B. Section 11 Claim

Plaintiff next brings a claim under Section 11 of the Securities Act of 1933. 15 U.S.C. § 77k. Section 11 creates civil liability for misstatements of material fact contained in registration statements, including S-4 registration statements. Plaintiff argues that Defendant's S-4 contains misstatements, since in several places it states that Class B CDBL-III shares did not convert to Class A shares on May 12, 2009. (Dkt. No. 1, Pl.'s Compl. 16-17.) It is first important to note that whether these statements are misstatements depends on whether Plaintiff is successful in his declaratory judgment action. Since, as discussed above, Plaintiff is likely to succeed in his declaratory judgment action, Plaintiff is also likely to establish the existence of a misstatement in Defendant's S-4 for purposes of Section 11.

However, Section 11 also requires that the plaintiff had no actual knowledge of the misstatement when the plaintiff acquired stock issued pursuant to the allegedly defective registration statement. E.g., May v. Oil Field Sys. Corp., 803 F.2d 749, 755 (2d Cir. 1986); see also Louis Loss & Joel Seligman, Fundamentals of Securities Regulation 1230 (2004).

Plaintiff has actual knowledge of the possibility that Class B shares did convert to Class A shares on May 12, 2009. His declaratory judgment action is based on this knowledge. Thus, Plaintiff is not likely to succeed on the merits of his Section 11 claim.

## 2. Irreparable Harm

Plaintiff argues that there are two irreparable harms that he is likely to suffer if the Court does not enjoin the expiration of the exchange offer. Plaintiff's first claimed irreparable harm is that, if the Court does not enjoin the expiration of the exchange offer, Plaintiff will become part of the minority voting contingency of outstanding shares of CDBL-III, and thus be powerless to stop the sale of certain CDBL-III assets such as the Bank of Santa Barbara. (Dkt. No. 1, Pl.'s Compl. 9, 14.) Plaintiff's second claimed irreparable harm is that, if the Court does not enjoin the expiration of the exchange offer, the exchange offer will close before Plaintiff knows the status of his shares, and Plaintiff will lose the opportunity to exchange his shares under the terms of the exchange offer if he finds out that he holds Class B rather than Class A shares. (Dkt. No. 11, Pl.'s Supp. Br. 1.) Though Plaintiff's first claimed irreparable harm is not entitled to a great deal of weight in the preliminary injunction analysis, Plaintiff's second claimed irreparable harm is sufficient to support a preliminary injunction.

A. Plaintiff's Entry into the CDBL-III Minority Voting Contingency

Plaintiff's first claimed irreparable harm is that, if the Court does not enjoin the expiration of the exchange offer, Plaintiff will become part of the minority voting

contingency of outstanding shares of CDBL-III, and thus be powerless to stop the sale of certain CDBL-III assets such as the Bank of Santa Barbara.[5] Plaintiff opposes the sale of these assets and would vote against it. (Dkt. No. 1, Pl.'s Compl. 9.) Defendant approves of the sale of these assets and would vote in favor of it. (Dkt. No. 1, Pl.'s Compl. 8-9.) Plaintiff will be part of the minority voting contingency on such a sale if a majority of CDBL-III shareholders, or currently at least 7873 shares, vote in favor of such a sale. One way that Plaintiff will become part of the minority voting contingency is if Defendant acquires 6873 CDBL-III shares pursuant to the exchange offer. Because Defendant currently holds 1,000 CDBL-III shares, this amount would give Defendant a majority of all outstanding CDBL-III shares entitled to vote on the sale of the Bank of Santa Barbara and other assets. Defendant admitted during oral argument that approximately 70%, or approximately 10,300, of the Class B shares have been tendered pursuant to the exchange offer so far. Thus, if the Court does not enjoin the expiration of the exchange offer, Defendant will likely obtain a sufficient number of shares to have complete voting control over CDBL-III, and put Plaintiff in the minority voting contingency on the vote to sell the Bank of Santa Barbara and other assets.

However, an injunction and a favorable decision in Plaintiff's declaratory judgment action probably would not avert this irreparable injury. If the Court enjoins the exchange offer and later determines that the May 12, 2009, conversion was effective, Defendant will

---

[5]Asset sales such as the one involved in this case are commonly held to constitute irreparable injuries because of the difficulty involved in undoing complex transactions. See Plaza Secs. Co. v. Fruehauf Corp., 643 F. Supp. 1535, 1545 (E.D. Mich. 1986); Eisenberg v. Chicago Milwaukee Corp., 537 A.2d 1051, 1151 (Del. Ch. 1987).

probably purchase at least 14,347 authorized but unissued shares of Class A CDBL-III stock.[6] This purchase would give Defendant a majority interest in CDBL-III and put Plaintiff in the minority voting contingency on the vote to sell the Bank of Santa Barbara and other assets. Additionally, even if Defendant did not decide to purchase 14,347 additional CDBL-III shares after a determination by this Court that the May 12, 2009, conversion was effective, if the Court issues the injunction Defendant still might obtain a majority of CDBL-III stock through the exchange offer, or, regardless of the level of participation in the exchange offer, a sufficient number of CDBL-III shareholders still might vote in favor of the sale of the Bank of Santa Barbara and other assets to put Plaintiff in the minority voting contingency. Thus, even though Plaintiff is likely to become part of the minority voting contingency in the vote to sell the Bank of Santa Barbara and other assets if this Court does not enjoin the exchange offer prior to a determination on Plaintiff's declaratory judgment action, Plaintiff is likely to suffer this irreparable injury regardless of whether the Court enjoins the expiration of the offer. For this reason, this claimed irreparable injury should not be given much weight in the permanent injunction analysis.

B.  Plaintiff's Lost Opportunity to Exchange his Shares

Plaintiff's second claimed irreparable harm is that, if the Court does not enjoin the expiration of the exchange offer, the exchange offer will close before Plaintiff knows the status of his shares, and Plaintiff will lose the opportunity to exchange his shares under the

_____

[6] See supra Part II.1.A.

terms of the exchange offer if he finds out that he holds Class B rather than Class A shares. This irreparable harm is compelling only if Plaintiff can establish that: (1) the exchange offer will close before Plaintiff knows the status of his shares; (2) after the exchange offer closes, Plaintiff will be unable to find a buyer for his shares that will offer him terms the same as or better than the exchange offer; (3) Plaintiff would be more likely to participate in the exchange offer if his shares were Class B than if they were Class A. Plaintiff has established all three of these conditions.

The first condition acknowledges that Plaintiff would not be harmed by the expiration of the exchange offer prior to a determination of the status of his shares if Plaintiff knew the status of his shares prior to the expiration of the exchange offer. Defendant argues that, regardless of the outcome of Plaintiff's declaratory judgment action, Plaintiff currently knows that he holds Class A shares. According to Defendant, even after the May 11, 2009, amendment, "each of the shareholders, including Plaintiff, still had (and has) the right to request a conversion [of Class B shares to Class A shares] by the Board," and that this right to request conversion, if exercised, would instantly make Plaintiff a Class A shareholder. (Dkt. 6, Def.'s Resp. 9). Defendant, however, does not identify the source of this right. The Court therefore will assume that the right to request conversion relied on by Defendant arises from the language in the Articles providing that conversion may occur on "any date designated by the Board of Directors in its sole discretion." (Dkt. No. 1, Pl.'s Compl. Ex. A at 2.) Even if this provision did provide Plaintiff with a right to request conversion at any

time, there is apparently nothing that obligates the CDBL-III Board to grant the request. Because the right to request conversion appears to the Court to be illusory, Plaintiff and the other Class B shareholders will not know the status of their shares with certainty until the Court adjudicates Plaintiff's declaratory judgment action, which will inevitably happen after the expiration of the exchange offer.

The second condition acknowledges that Plaintiff would not be harmed by the expiration of the exchange offer prior to a determination of the status of his shares if the exchange offer did not represent a unique and attractive offer for Class B shares. In this case, Plaintiff could easily mitigate any harm resulting from the expiration of the exchange offer prior to a determination of the status of his shares by tendering those shares to another buyer on terms the same as or better than those offered by the exchange offer. However, the exchange offer does represent a unique and attractive offer for Class B shares. There is currently no public market for CDBL-III shares, and according to the S-4 registration statement itself, "[t]here is no assurance that [CBC] or any other party will provide [CDBL-III shareholders who reject the exchange offer] with an additional opportunity to achieve liquidity in [their] shares of a CDBL." (Def.'s Ex. 1 at 4.)

The third condition acknowledges that Plaintiff would not be harmed by the expiration of the exchange offer prior to a determination of the status of his shares if Plaintiff had unequivocally resolved not to participate - or to participate - in the exchange offer regardless of the status of his shares. In this case, a determination of the status of Plaintiff's shares

would not contribute to his decision to participate in the offer even if it did come before the expiration of the offer, and so an injunction would not be necessary. However, Plaintiff has indicated that the status of his shares is material to his decision to participate in the exchange offer. (Dkt. No. 11 Pl.'s Supp. Br. 1 (arguing that Plaintiff will "lose the opportunity to evaluate the Exchange Offer with an accurate understanding — based on a declaration from this Court — of what exactly [he] would be giving up by tendering [his] shares.") If he holds Class A shares, he is less likely to participate in the offer than if he holds Class B shares.

The differences between Class A and Class B shares justify Plaintiff's desire to wait until he knows the status of his shares before he decides whether to participate in the offer. Class A shareholders enjoy full voting rights in CDBL-III, while Class B shareholders are entitled only to limited voting rights. (Dkt. No. 11, Pl.'s Supp. Br. 2-3.) Additional voting rights not only provide Class A shareholders with a say in a broader spectrum of corporate affairs, but they correlate to an increased value of the shares. (Def.'s Ex. B.) The increased voting rights and value associated with Class A shares might make the exchange offer a good deal if the shares are Class B, but a bad deal if the shares are Class A.

Plaintiff also argues that, not only are Class A shares more valuable than Class B shares because they are entitled to full voting rights, but that they are more valuable because of the massive injection of capital into CDBL-III that Defendant would make if the Court determines that Class B shares converted to Class A on May 12, 2009. As explained in Part II.1.A, if the Court determines that Class B shares converted to Class A shares on May 12,

2009, Defendant will have a strong incentive to purchase 14,347 authorized but unissued Class A shares in order to honor its commitment to the Federal Reserve to retain a majority interest in Class A CDBL-III stock. Whether such a purchase would increase the value of all the existing CDBL-III shares depends on whether Defendant would pay a per share price higher or lower than the per share value of the existing shares at the time of the purchase. A higher per share price would increase the value of existing shares, while a lower price would decrease it.

Part 2.1.A concludes that, if Defendant made this purchase, the per share price might be as high as $2,000, but in no event would it be lower than the value of the shares at the time of the purchase since such a price would probably not be a "fair" price. The Court set the ceiling of the likely purchase price range at $2,000 because a Warrant agreement between CDBL-III and Defendant provided that Defendant had the right to purchase up to 14,500 shares at that price. However, the Warrant agreement expired on June 30, 2009. Even though a determination by this Court that the May 11, 2009, amendment was invalid would essentially equate to a determination that Class B shares converted to Class A on May 12, 2009, a date before the expiration of the Warrant agreement, any decision by Defendant to purchase new CDBL-III shares will now come as a response to this Court's determination of Plaintiff's declaratory judgment action, at a date inevitably after the expiration of the Warrant agreement.

Because the Warrant agreement, along with its contemplated exercise price of $2,000 per share, cannot possibly govern any decision by Defendant to purchase new CDBL-III share from this date forward, the Antidilution Agreement would apply to such a purchase exclusively. The Antidilution Agreement permits the CDBL-III Board of Directors to set a "fair" purchase price for the shares. (Def.'s Ex. 2.) Absent convincing evidence otherwise, the Court will assume that a "fair" purchase price would neither dilute nor augment the value of the existing shares. For this reason, the only differences between Class A and Class B shares of CDBL-III that the Court will consider in determining whether Plaintiff is justified in waiting for a determination on the status of his shares before he participates in the exchange offer are the differences in voting rights and any incidental differences in value that flow from the differences in voting rights. But as explained above, these differences are sufficient to convince the Court that the Plaintiff would be more likely to participate in the exchange offer if his shares were Class B than if they were Class A

The exchange offer will close before Plaintiff knows the status of his shares. After the exchange offer closes, Plaintiff will be unable to find a buyer for his shares that will offer him terms the same as or better than the exchange offer. Plaintiff would be more likely to participate in the exchange offer if he knew that his shares were Class B than if they were Class A. For these reasons, Plaintiff will be irreparably harmed if the Court does not enjoin the expiration of the exchange offer, because the exchange offer will close before Plaintiff knows the status of his shares and Plaintiff will lose the opportunity to exchange his shares

under the terms of the exchange offer if he finds out that he holds Class B rather than Class A shares.

### 3. Substantial Harm to Others

After determining that Plaintiff is likely to succeed in his declaratory judgment action and that Plaintiff is likely to suffer irreparable harm in the absence of a preliminary injunction, the Court undertakes this prong of the analysis under the presumption that the preliminary injunction balancing test tips in favor of granting the injunction. See, e.g., MetroBanc v. Federal Home Loan Bank Bd., 666 F. Supp. 981, 984 (E.D. Mich. 1987) ("A specific finding of irreparable injury to the movants is the single most important prerequisite that the Court must examine when ruling upon a motion for a preliminary injunction."). The Court concludes that the Defendant has not demonstrated that an injunction will result in harm to others sufficient to preclude the issuance of a preliminary injunction.

The Court first considers the harm to the Defendant. Defendant has not identified any substantial harm that it will suffer if the Court issues the preliminary injunction. A preliminary injunction would postpone the expiration of the exchange offer for a limited period of time. Defendant would be free to recommence the exchange offer after Plaintiff's declaratory judgment action has been adjudicated. The injunction would likely present some inconvenience to Defendant, but there is no indication that a substantial harm sufficient to preclude an injunction is at stake.

Second, the Court acknowledges that the preliminary injunction may result in some harm to CDBL-IV, V, and VI shareholders who wish to participate in the exchange offer. Defendant's S-4 offers a stock exchange package not only to CDBL-III shareholders, but to shareholders of CDBL-IV, V, and VI as well.  (Def.'s Ex. 1.)  A preliminary injunction would apply to the entire registration statement.  It would therefore enjoin Defendant from exchanging CBC stock for shares of CDBL-IV, V, and VI in addition to shares of CDBL-III, even though shareholders of CDBL-IV, V, and VI apparently have no direct interest in the outcome of Plaintiff's declaratory judgment action.  However, as with Defendant, even though this may present some inconvenience to shareholders of CDBL-IV, V, and VI, there is no indication that they will suffer a substantial harm.  Further, an injunction would not catch the prospective participants by complete surprise.  The registration statement itself contemplates the issuance of an injunction to postpone or abolish the expiration of the offer, and makes the lack of such an injunction a condition precedent to Defendant's obligation to exchange. (Def.'s Ex. 1 at 9.) Shareholders of CDBL-IV, V, and VI who have already tendered their shares did so with the knowledge that an exchange would not occur if the expiration of the offer was enjoined.

### 4. The Public Interest

A preliminary injunction would be in the public interest.  Like Plaintiff, all CDBL-III shareholders have a right to know the status of their shares before they are forced to decide whether to irrevocably surrender them pursuant to the terms of the exchange offer.

### III. Conclusion

Plaintiff has demonstrated that he is likely to succeed on the merits of his declaratory judgment action, though not his Section 11 claim. Plaintiff has demonstrated that he is likely to suffer irreparable harm if the Court does not issue the injunction. Substantial harm is not likely to result to Defendant or third parties if the Court does not issue the injunction. It would be in the public interest to issue the injunction. Since all four factors of the preliminary injunction suggest that an injunction is appropriate, the Court shall enjoin Defendant from closing the exchange offer before the Court can fully adjudicate Plaintiff's declaratory judgment action and action under Section 11 of the Securities Act of 1933.

An order consistent with this opinion will be entered.


Dated: September 21, 2009                    /s/ Robert Holmes Bell
                                             ROBERT HOLMES BELL
                                             UNITED STATES DISTRICT JUDGE