UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


HUMBERTO S. LOPEZ, Trustee of the H.S.
LOPEZ FAMILY TRUST,

      Plaintiff,

v.

CAPITOL BANCORP LTD., a Michigan
corporation, and CAPITOL DEVELOPMENT
BANCORP LIMITED III, a Michigan
corporation,

      Defendants.
_____/

File No. 1:09-CV-814

HON. ROBERT HOLMES BELL

## **O P I N I O N**

On September 21, 2009, this Court entered an opinion and order granting Plaintiff's motion for a preliminary injunction enjoining Defendant Capitol Bancorp Ltd. ("CBC") from closing its offer to exchange shares of CBC Series A Preferred and Trust Preferred stock for shares of CDBL-III, IV, V and VI stock pursuant to an exchange offer initiated under an S-4 registration statement. (Dkt. Nos. 15, 16.) On September 22, 2009, Defendants filed a motion asking this Court to dissolve the injunction issued on September 21, 2009, in light of a resolution adopted by the CDBL-III board of directors on September 23, 2009, converting all shares of Class B CDBL-III stock to shares of Class A CDBL-III. (Dkt. No. 17.) For the reasons that follow, Defendants' motion to dissolve the injunction will be granted.

## I.

This Court based its decision to grant Plaintiff's request for a preliminary injunction in large part on its determination that Plaintiff would suffer an irreparable harm if Plaintiff was forced to decide whether to participate in the exchange offer before knowing the status of his shares. (Dkt. No. 15, Op. 16-21.) Plaintiff now knows the status of his shares with ample time to decide whether to participate in the exchange offer. (Dkt. No. 21, Def.'s Reply Ex. A.) Thus, Plaintiff's irreparable harm has been extinguished and a preliminary injunction is no longer appropriate.

In its September 21, 2009, opinion, the Court held that the only differences between Class B and Class A shares that justified Plaintiff's desire to wait to know the status of his shares before being forced to decide whether to participate in the exchange offer were the differences in the voting rights of the shares and any incidental differences in value flowing from those differences in voting rights. (Dkt. No. 15, Op. 21.) The Court therefore did not accept Plaintiff's previous argument that, had the shares converted to Class A on May 12, 2009, they would have increased in value because Defendant CBC would have made a large capital injection into CDBL-III. The Court did acknowledge that the shares would not have decreased in value had conversion occurred on May 12, 2009, and that the shares *might* have increased in value *if* Defendant CBC had decided to exercise its Warrants at a price of $2,000 per share, or any price above the book value of each existing share at the time of purchase. (Id. at 10-11.) However, the evidence is insufficient for the Court to conclude with certainty

2

that Defendant CBC would have exercised its Warrants at a price of $2,000 per share after conversion and increased the value of the existing shares. See, e.g., Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog, 945 F.2d 150, 154 (6th Cir. 1991) ("[T]he harm alleged [in support of a preliminary injunction] must be . . . certain . . . rather than speculative . . . .").

First, Defendant CBC might not have decided to purchase additional shares of CDBL-III at all. CBC may have decided to accept the consequences of non-compliance with the Federal Reserve mandate rather than inject millions of dollars of additional capital into CDBL-III. Second, even if Defendant CBC would have purchased additional Class A shares following the May 12 conversion, it might have done so pursuant to the Antidilution Agreement rather than the Warrant agreement,[1] and, as the Court has held, such a purchase likely would not have altered the value of the shares. (Dkt. No. 15, Op. 21.) Finally, even if Defendant CBC would have purchased additional shares pursuant to the Warrant agreement, the CDBL-III board of directors could have reduced the $2,000 exercise price required by the Warrant agreement to a price that would not have increased the value of the other CDBL-III shares. (Def.'s Ex. 3.)

---

[1]Plaintiff argues that CBC could not use the Antidilution Agreement to regain voting control of CDBL-III because the Antidilution Agreement limited CBC's purchase to 51% of the 35,000 authorized but unissued CDBL-III Class A shares, and this number of shares would not be enough for CBC to regain voting control after conversion. (Dkt. No. 27, Pl.'s Resp. 8-9.) However, the Antidilution Agreement permits CBC to purchase *at least* 51% of the stock in any offering. Nothing in the Antidilution Agreement prohibits the CDBL-III board of directors from permitting CBC to purchase more than 51% of a stock in a given offering. (Def.'s Ex. 2.)

These contingencies create a significant likelihood that, even if conversion occurred on May 12, 2009, Defendant CBC would not have exercised its Warrants at a price of $2,000 per share or provided any increase in the value of the other CDBL-III shares. The Court thus reiterates that the only differences between Class B and Class A shares that justify Plaintiff's desire to wait to know the status of his shares before being forced to decide whether to participate in the exchange offer are the differences in the voting rights of the shares and any incidental differences in value flowing from those differences in voting rights. Plaintiff now knows that he holds Class A shares, and that he is entitled to the full array of voting rights that accompany Class A shares. Plaintiff is now in a position to make an informed decision as to whether to participate in the exchange offer before it closes. Plaintiff's irreparable harm has therefore been extinguished.

## II.

Plaintiff also argues that the duty to withdraw shares tendered pursuant to the exchange offer imposed on former Class B shareholders somehow makes shares that converted on May 12, 2009 more desirable than shares that converted on September 23, 2009. (Dkt. No. 27, Pl.'s Resp. 12-13.) This argument is unavailing for two reasons. First, whatever burdens that accompany the withdrawal of tendered shares would not be avoided by a May 12, 2009 conversion date. Shareholders who have tendered would still need to undertake the withdrawal process. Second, because Plaintiff has not tendered any shares of CDBL-III, Plaintiff cannot possibly be subject to the burdens that accompany the withdrawal

of tendered shares, and so these burdens are irrelevant to whether Plaintiff has suffered an irreparable harm. The Court acknowledges that, if there are burdens that accompany the withdrawal of tendered shares, those who have tendered shares may be subject to these burdens. However, the harm to CDBL-III shareholders other than Plaintiff played only a small part in this Court's decision to grant the preliminary injunction. (Dkt. No. 15, Op. 23.) The harm to the Plaintiff is the center focus of the preliminary injunction analysis, see MetroBanc v. Fed. Home Loan Bank Bd., 666 F. Supp. 981, 984 (E.D. Mich. 1987), and Plaintiff will not be subject to the burdens of withdrawal because Plaintiff has not tendered any shares of CDBL-III.

## III.

Plaintiff next argues that this Court should not dissolve the preliminary injunction because Plaintiff has been denied access to CDBL-III's books and records in violation of Mich. Comp. Laws § 450.1487. (Dkt. No. 27, Pl.'s Resp. 13-15.) Plaintiff argues that the Court should not permit the exchange offer to close until Plaintiff can communicate with other CDBL-III shareholders regarding the mechanics of the September 23 resolution. First, as discussed above, the Court is primarily concerned with the harm that will result to Plaintiff in the absence of a preliminary injunction. The harm to other CDBL-III shareholders is merely an ancillary consideration. (Dkt. No. 15, Op. 23.) Because Plaintiff now knows the status of his shares, his irreparable harm has been extinguished. Second, to the extent the Court is concerned with the harm to the other CDBL-III shareholders, the Court holds that

5

Defendant CBC's promise to mail the S-4 supplement reflecting the September 23 conversion to CDBL-III shareholders ten days prior to the expiration of the exchange offer is sufficient to apprise these shareholders of the status of their shares with enough time for them to make an informed decision as to whether to participate in the offer. (Dkt. No. 29, Def.'s Reply Ex. A.) A mailing campaign undertaken by Plaintiff is not necessary to alleviate the harm to the other CDBL-III shareholders.

## IV.

Finally, Plaintiff argues that, because the September 23 conversion resulted in additional misstatements in Defendant CBC's S-4, the Court should not dissolve the injunction. (Dkt. No. 27, Pl.'s Resp. 10-11.) The Court has never held that Defendant's alleged violations of Section 11 of the Securities Act of 1933 contributed to Plaintiff's irreparable harm. Plaintiff's irreparable harm resulted from his ignorance of the status of his shares. Now that Plaintiff knows the status of his shares, the irreparable harm has been extinguished. Plaintiff is entitled to pursue an action under Section 11, but allegations of misstatements in Defendant's S-4 do not result in irreparable harm to Plaintiff sufficient to justify the continuation of the preliminary injunction.

## Conclusion

Plaintiff's argument that a May 12, 2009 conversion date would have led Defendant CBC to inject capital into CDBL-III sufficient to raise the value of all CDBL-III stock constitutes mere speculation. Conversely, a May 12, 2009 conversion date would have

undoubtedly afforded Plaintiff increased voting rights. Plaintiff assumed those increased voting rights on September 23, 2009, with sufficient time to decide whether to participate in the exchange offer prior to its expiration. For this reason, the September 23 conversion abrogated Plaintiff's irreparable harm as well as the need for a preliminary injunction.

An order consistent with this opinion will be entered.


Dated: <u>September 30, 2009</u>  /s/ Robert Holmes Bell
ROBERT HOLMES BELL
UNITED STATES DISTRICT JUDGE